# Court of Appeals, State of Michigan

## ORDER

In re App of Detroit Edison for 2012 Cost Recovery Plan

Docket No.    318388

LC No.    00-016892

Mark T. Boonstra
Presiding Judge

Henry William Saad

Christopher M. Murray
Judges

The Court orders that, due to a typographical error, the May 12, 2015 opinion in this matter is VACATED and a new opinion is attached.

The Court further orders that the motion for reconsideration is DENIED.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUN 2 3 2015
_____
Date

_____
Chief Clerk

# STATE OF MICHIGAN

# COURT OF APPEALS

IN RE APPLICATION OF DETROIT EDISON
COMPANY FOR 2012 COST RECOVERY
PLAN

FOR PUBLICATION
June 23, 2015
9:05 a.m.

MICHIGAN ENVIRONMENTAL COUNCIL,

        Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,

        Appellee,

and

DETROIT EDISON COMPANY,

        Petitioner-Appellee.

MPSC
No. 318388

LC No. 00-016892

Before: BOONSTRA, P.J., and SAAD and MURRAY, JJ.

PER CURIAM.

Petitioner Michigan Environmental Council (MEC) appeals by right from an order of the Michigan Public Service Commission (PSC) granting the application filed by Detroit Edison Company (Edison) to implement a power supply cost recovery (PSCR) plan in its rate schedules for the 2012 metered jurisdictional sales of electricity, and for approval of its five-year forecast. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case concerns MEC's challenge to Edison's Reduced Emission Fuel (REF) project. This project involves applying chemical additives to coal to produce REF. Edison maintains that the use of REF results in reduced sulfur dioxide ($SO_2$), mercury, and possibly nitrous oxides ($NO_x$) emissions, and thus reduced emission expenses. Edison proposed to sell at book cost a portion of its coal inventory to affiliated unregulated fuels companies Belle River Fuels

-1-

Company (BRFC) and the St. Clair Fuels Company (SCFC). The coal would be chemically treated at those plants and then sold back to Edison.

The PSC considered the REF project in an earlier case[1] but did not grant Edison permission to implement the project at that time, finding that it needed more information on the efficacy of the methods for reducing emissions. The PSC also required Edison to demonstrate that the REF project was a reasonable and prudent method of achieving maximum emission reduction at minimum cost, and that the REF project complied with the PSC's Code of Conduct.[2]

On September 30, 2011, Edison filed an application requesting authority to implement a PSCR plan in its rates schedules for the 2012 metered jurisdictional sales of electricity. The application indicated that Edison intended to move forward with implementation of its REF project, but represented that the decision would have no impact on the requested maximum PSCR factor for 2012.

The Proposal for Decision (PFD) issued by the administrative law judge (ALJ) assigned to the case recommended that Edison be denied permission to implement the REF project; however, the PSC granted Edison's application to implement a PSCR plan. The PSC addressed Edison's REF project as follows:

> The Commission finds that Detroit Edison's REF project should be approved and that it complies with the Code of Conduct and the Guidelines. The Commission reviewed the company's testimony and Exhibits A-21 through A-23 and finds that Detroit Edison, in compliance with the directive in the December 6 order, provided the Commission with sufficient additional information to evaluate the reasonableness and prudence of the REF project.

---

[1] See PSC Case No. U-16434.

[2] The Legislature enacted 2000 PA 141, the Customer Choice and Electricity Reliability Act (Act 141), MCL 460.10 *et seq.*, to further the deregulation of the electric utility industry. *Detroit Edison Co v Public Serv Comm No 1*, 261 Mich App 1, 4; 680 NW2d 512 (2004), vacated in part on other grounds 472 Mich 897 (2005). Act 141 required the PSC to implement a code of conduct to be applicable to all regulated electric utilities. MCL 460.10a(4) provides:

> (4) No later than December 2, 2000, the commission shall establish a code of conduct that shall apply to all electric utilities. The code of conduct shall include, but is not limited to, measures to prevent cross-subsidization, information sharing, and preferential treatment, between a utility's regulated and unregulated services, whether those services are provided by the utility or the utility's affiliated entities. The code of conduct established under this subsection shall also be applicable to electric utilities and alternative electric suppliers consistent with section 10, this section, and section 10b through 10cc.

The PSC adopted its Code of Conduct in 2001.

The Commission believes that the REF project is a reasonable means of attaining maximum emission reductions for minimum cost. As explained by Detroit Edison, at SCPP and BRPP, PSCR customers will receive a reduction in annual working capital expense through the sale, at market price, of a portion of the company's coal inventory to its affiliated fuels companies. The affiliated fuels companies will treat the coal with REF adder and then resell the treated coal to Detroit Edison. The cost of the REF adder will be offset by a corresponding savings in PSCR emissions allowance expense, resulting in a net cost of zero or less to PSCR customers. At MPP, Detroit Edison receives a coal fee rate from the affiliated fuels company, reducing the cost of every ton of coal treated with REF adder that is consumed, which translates into a credit for the company's PSCR customers.

In response to the ALJ's finding that Detroit Edison did not provide any of the actual contracts between the company and its affiliated fuels companies for consideration, the Commission agrees with Detroit Edison that Act 304 only requires a description of all relevant major contracts, but does not require admission of the actual contracts. In addition, the Commission agrees with Detroit Edison and the Staff that the company's eligibility for the tax credits and the potential for the affiliated fuels companies to profit from the REF project is irrelevant to an Act 304 proceeding. As explained by Detroit Edison, Act 304 does not permit "the Commission to include third party expenses or revenues related to coal or any other fuel supply into Act 304 review and ratemaking." Detroit Edison's replies to exceptions, p. 27. As a result, the Commission may not consider whether the tax credits may be used to offset fuel costs.

The Commission disagrees with the Attorney General that REF costs should be treated as O&M costs. As explained by Detroit Edison, MCL 460.6j(13)(d) refers to "fuel movement that occurs after the utility receives the fuel at the power plant." Detroit Edison's replies to exceptions, p. 21. The Commission finds that all of the coal processing costs take place before the coal is delivered to the company.

Based on the evidence presented in Exhibits A-21 and A-23, the Commission finds that the REF project complies with the Code of Conduct. There is structural separation between the company and its affiliated fuels companies; they do not engage in joint advertising, marketing, or other promotional activities related to the provision of the fuels processing service; and there is no preferential treatment for or subsidization of the affiliated fuels companies by Detroit Edison.

The Commission finds that Detroit Edison has complied with Section III.C of the Code of Conduct. As discussed previously, the record supports that Detroit Edison purchases coal from a third party at market price, then sells the coal at the same market price to its affiliated fuels companies. The cost of the coal for the affiliated fuels companies is Detroit Edison's booked costs, or its fully embedded cost. Therefore, both the market cost and the fully allocated embedded cost is

-3-

higher than the other, compensation to Detroit Edison by the affiliated fuels companies complies with Section III.C of the Code of Conduct.

When the affiliates resell the treated coal to Detroit Edison, it is for the same market price the affiliated fuels companies paid to the company (or in this case, the fully allocated embedded cost), plus the cost of REF adder. The price of the treated coal is offset by a corresponding savings in PSCR emissions allowance expense, resulting in zero cost for the treated coal. Under Section III.C of the Code of Conduct, compensation to the affiliated fuels companies by Detroit Edison for the treated coal must be the lower of market price or 10% over fully allocated embedded costs. Because market price and the fully allocated embedded cost are the same in this case, the Commission finds that market price is lower than 10% over the fully allocated embedded cost. By paying the affiliated fuels companies market price for the treated coal, Detroit Edison has complied with Section III.C of the Code of Conduct.

The Commission agrees with Detroit Edison that the company did not violate the pre-sale notification requirements of the Guidelines with the sale of its coal inventory. As stated by Detroit Edison, the pre-sale notification requirement was intended to provide the Commission with notice of intent to sell significant utility plant property, and not the routine sales involved here. The Commission finds that Detroit Edison's sale of its coal inventory is not utility plant property, but is part of the utility's day-to-day business.

Based on the testimony and evidence provided by Detroit Edison, the Commission finds credible Detroit Edison's claim that it investigated REF arrangements with the two other licensees, CERT and A.J. Gallagher, but that DTEES offered Detroit Edison the best deal. Detroit Edison provided substantial testimony about the price of REF adder at other licensees' facilities and provided ample evidence that Detroit Edison's customers would have paid more had the company contracted with these other companies.

The PSC approved Edison's application for a PSCR plan for Edison's 2012 metered jurisdictional electric sales and the REF project. This appeal followed.

## II. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well defined. Pursuant to MCL 462.25, all rates, fares, charges, classification and joint rates, regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. See *Michigan Consol Gas Co v Public Serv Comm*, 389 Mich 624, 635-636; 209 NW2d 210 (1973). A party aggrieved by an order of the PSC has the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8). To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a mandatory statute or abused its discretion in the exercise of its judgment. See *In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999). An order is unreasonable if it is not supported by the

-4-

evidence. See *Associated Truck Lines, Inc v Public Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; *Attorney General v Public Serv Comm*, 165 Mich App 230, 235; 418 NW2d 660 (1987).

This Court gives due deference to the PSC's administrative expertise, and is not to substitute its judgment for that of the PSC. *Attorney General v Public Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225 (1999). We give deference to the PSC's interpretation of its own Code of Conduct; however we apply principles of statutory construction in our review of that Code and its statutory underpinnings. See *In re Complaint of Consumers Energy Co*, 255 Mich App 496, 503-504; 660 NW2d 785 (2002). If the language of a statute is vague or obscure, the PSC's construction serves as an aid to determining legislative intent, and will be given weight if it does not conflict with the language of the statute or the purpose of the Legislature. However, the construction given to a statute or the PSC's Code of Conduct by the PSC is not binding on us. See *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103-109; 754 NW2d 259 (2008). Whether the PSC exceeded the scope of its authority is a question of law that we review de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

### III. CODE OF CONDUCT

On appeal, MEC argues that the PSC erred in finding that Edison's REF project complied with the Code of Conduct. We disagree.

The purpose of the PSC's Code of Conduct is to "promote fair competition by establishing measures to prevent cross-subsidization, information sharing, and preferential treatment between the regulated and unregulated operations of electric utilities, alternative electric suppliers, and their affiliates." Code of Conduct, Preface.

Section II of the Code of Conduct, entitled Separation, provides in part:

An electric utility or alternative electric supplier that offers, itself or through its affiliates, both regulated and unregulated services shall do so with the structural or functional separation needed to prevent cross-subsidization, information sharing, and preferential treatment between the regulated and unregulated services. This includes, but is not limited to, the following:

B. An electric utility's or alternative electric supplier's regulated services shall not subsidize in any manner, directly or indirectly, the unregulated business of its affiliates or other separate entities.

Section III of the Code of Conduct, entitled Discrimination, provides in part:

An electric utility or alternative supplier that offers, itself or through its affiliates, both regulated and unregulated services shall not unduly discriminate in

favor of or against any party, including its affiliates. This includes, but is not limited to, the following:

C. If an electric utility or alternative electric supplier offering regulated service in Michigan provides services, products, or property to any affiliate or other entity within the corporate structure, compensation shall be based upon the higher of fully allocated embedded cost or market price. If an affiliate or other entity within the corporate structure provides services, products, or property to an electric utility or alternative electric supplier offering regulated service in Michigan, compensation for services and supplies shall be at the lower of market price or 10% over fully allocated embedded cost or market price.

MEC argues that Edison's sale of coal to the fuels companies, and the repurchase of treated coal at the same price from them, violates the Code of Conduct in that: (1) the sale subsidizes the fuels companies because the companies are able to receive favorable tax treatment as a result of the transactions, and (2) Edison's sale of the coal at the fully allocated embedded cost and repurchase of the coal at the same price violates the pricing provision of the Code of Conduct.

MEC cites no authority to support its arguments. An appellant's failure to properly address the merits of an argument constitutes the abandonment of an issue. *Woods v SLB Prop Mgt, LLC*, 277 Mich App 622, 626; 750 NW2d 228 (2008). At any rate, we find that MEC's argument is without merit. The Code of Conduct prohibits acts that result in cross-subsidization and preferential treatment between a regulated utility and an unregulated affiliate. Code of Conduct, Preamble. A "subsidy" is defined as "any grant or contribution of money." *Random House Webster's College Dictionary* (1997), p 1284. Nothing in the Code prevents an unregulated affiliate from making a profit from a project with a regulated utility. The fuels companies gained tax benefits from selling treated coal to Edison. The undisputed evidence showed that Edison could not have obtained those same tax benefits. There is no evidence establishing that, had Edison done business with an unaffiliated company rather than with its affiliates, that company would not have also obtained the same tax benefits. Edison did not give or grant money to the fuels companies, and did not subsidize the companies in any indirect way.

In addition, MEC presents no evidence to support its assertion that Edison's sale of coal to the fuels companies at the fully allocated embedded cost, which is the same as the market price at which Edison bought the coal, and Edison's repurchase of the coal from the fuels companies at the same price, violate the pricing provisions of the Code of Conduct. MEC asserts that the value added to the coal from the treatment by the fuels companies should have factored into the repurchase price, but does not indicate how that could have been done or if Edison could have done so effectively without violating Section III.C of the Code of Conduct.

Further, MEC's assertion that the PSC should have required Edison to submit the actual contracts with the fuels companies rather than simply describing the contracts is without merit. MCL 460.6j(3) states that a PSCR plan "shall describe all major contracts and power supply arrangements entered into by the utility[.]" The PSC did not indicate that it was unable to resolve the issue without examining the actual contracts.

Finally, we reject MEC's assertion that the PSC's finding that Edison investigated the possibility of entering into contracts with unaffiliated companies was not supported by the evidence. Edison's witness testified that other Edison employees had investigated the possibility of contracting with unaffiliated companies but that no such arrangements were made. The PFD described the witness's testimony as not credible, but the PSC found to the contrary. The PSC was entitled to accept the testimony from Edison's witness even if the record contained evidence that contradicted that testimony. See *Great Lakes Steel Div of Nat'l Steel Corp v PSC*, 130 Mich App 470, 481-482; 344 NW2d 321 (1983).

MEC obviously disagrees with the PSC's conclusion regarding subsidization, but has offered no direct evidence to establish that Edison's arrangement with the fuels companies violated the Code of Conduct. MEC has not established that the PSC's order is unlawful or unreasonable. MCL 462.26(8).

## IV. FUELS COMPANIES' TAX CREDIT REVENUE

Next, MEC argues that the PSC erred in holding that the revenue generated for the fuels companies from tax credits was irrelevant to determining whether Edison took all appropriate steps to minimize its costs. We disagree.

MCL 460.6j(6) provides:

(6) In its final order in a power supply and cost review, the commission shall evaluate the reasonableness and prudence of the decisions underlying the power supply cost recovery plan filed by the utility pursuant to subsection (3), and shall approve, disapprove, or amend the power supply cost recovery plan accordingly. In evaluating the decisions underlying the power supply cost recovery plan, the commission shall consider the cost and availability of the electrical generation available to the utility; the cost of short-term firm purchases available to the utility; the availability of interruptible service; the ability of the utility to reduce or to eliminate any firm sales to out-of-state customers if the utility is not a multi-state utility whose firm sales are subject to other regulatory authority; whether the utility has taken all appropriate actions to minimize the cost of fuel; and other relevant factors. The commission shall approve, reject, or amend the 12 monthly power supply cost recovery factors requested by the utility in its power supply cost recovery plan. The factors shall not reflect items the commission could reasonably anticipate would be disallowed under subsection (13). The factors ordered shall be described in fixed dollar amounts per units of electricity, but may include specific amounts contingent on future events.

The PSC has only that authority granted to it by statute. *Union Carbide Corp v Public Serv Comm*, 431 Mich 135, 148-150; 428 NW2d 322 (1998). The Legislature must grant authority by "clear and unmistakable" statutory language. *Michigan Electric Coop Ass'n v Public Serv Comm*, 267 Mich App 608, 616; 705 NW2d 709 (2005).

The gravamen of MEC's argument is that the PSC erred by failing to consider the fact that the fuels companies received favorable tax treatment by dealing with Edison, and that

Edison should have negotiated more advantageous arrangements with the fuels companies to account for the fact that the companies were able to obtain tax credits for selling treated coal to Edison. However, MEC points to no statutory authority that allows the PSC to consider another party's tax benefits when determining whether a utility's decisions underlying its PSCR plan were reasonable and prudent. These tax advantages were not available to Edison, and Edison had no apparent control over the amount of the credit each company would receive. In addition, MEC fails to explain how Edison could determine what amounts to account for when negotiating the contracts, i.e., how much in tax credits the fuels companies would obtain, and whether Edison could account for these amounts and still comply with section III.C of the Code of Conduct.

The PSC had no clear authority to consider the fuels companies' tax credits when determining whether Edison's PSCR decisions were reasonable and prudent. Thus, the PSC did not err in failing to consider the tax credits. The PSC's decision was not unlawful or unreasonable. MCL 462.26(8).

Finally, MEC argues that the PSC's order was not supported by competent, material, and substantial evidence on the whole record. We disagree. MEC waived this issue by failing to raise it before the PSC. See *Shaw v Ecorse*, 283 Mich App 1, 22; 770 NW2d 31 (2009). Nevertheless, we find that the issue is without merit. MEC's argument is simply a restatement of the unpersuasive arguments made elsewhere.

## V. CONCLUSION

For the reasons stated above, we hold that the PSC's order granting Edison's application to implement a PSCR plan in its rate schedules for the 2012 metered jurisdictional sales of electricity and for approval of Edison's five-year forecast is lawful and reasonable. MCL 462.26(8).

Affirmed.

/s/ Mark T. Boonstra
/s/ Henry William Saad
/s/ Christopher M. Murray