*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

*In re* RELIABILITY PLANS OF ELECTRIC
UTILITIES FOR 2017-2021.

ASSOCIATION OF BUSINESSES
ADVOCATING TARIFF EQUITY,

        Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,
CONSUMERS ENERGY COMPANY, ENERGY
MICHIGAN, INC., and MICHIGAN ELECTRIC
AND GAS ASSOCIATION,

        Appellees.

UNPUBLISHED
December 3, 2020

No.   340600
Public Service Commission
LC No.   00-018197

*In re* RELIABILITY PLANS OF ELECTRIC
UTILITIES FOR 2017-2021.

ENERGY MICHIGAN, INC.,

        Appellant,

v

MICHIGAN PUBLIC SERVICE COMMISSION,
CONSUMERS ENERGY COMPANY, and
MICHIGAN ELECTRIC AND GAS
ASSOCIATION,

        Appellees.

No.   340607
Public Service Commission
LC No.   00-018197

ON REMAND

Before: METER, P.J., and GADOLA and TUKEL, JJ.

PER CURIAM.

At the end of 2016, our Legislature enacted new electric utility legislation that included Act 341. That act added, among other statutory sections, MCL 460.6w. As part of its implementation of MCL 460.6w, the Michigan Public Service Commission (MPSC) issued an order in its Case No. U-18197. That order of the MPSC was appealed to this Court in Docket No. 340600, by appellant Association of Businesses Advocating Tariff Equity (ABATE), and in Docket No. 340607, by appellant Energy Michigan, Inc. (Energy Michigan). In these consolidated cases,[1] appellants contended that the MPSC erred by determining that it is empowered by the Legislature under 2016 PA 341 (Act 341) to impose a local clearing requirement upon individual alternative electric suppliers.

In Docket No. 340607, Energy Michigan additionally contended that the order of the MPSC purports to impose new rules upon electric providers in this state without the required compliance with Michigan's Administrative Procedures Act of 1969 (APA), MCL 24.201, *et seq*. In Docket No. 340600, ABATE contended that the MPSC's claim of a statutory delegation of authority allowing the imposition of an individual local clearing requirement does not include sufficient standards to guide the PSC's exercise of what amounts to legislative policy-making, and thus violates the nondelegation doctrine.

This Court determined that the MPSC erred by determining that it is empowered by the Legislature under Act 341 to impose a local clearing requirement upon individual alternative electric suppliers; we therefore reversed the MPSC's order. *In re Reliability Plans of Electric Utilities for 2017-2021*, 325 Mich App 207, 228, 235; 926 NW2d 584 (2018). In light of that decision, we concluded that it was unnecessary to reach the additional issues raised by Energy Michigan and ABATE, being whether the MPSC's determination resulted in the promulgation of rules without compliance with the APA and in violation of the nondelegation doctrine. *Id*. at 234-235.

Thereafter, our Supreme Court considered plaintiffs' application for leave to appeal to that Court and, in lieu of granting leave to appeal, reversed the judgment of this Court and remanded the case to us for further proceedings consistent with that Court's opinion, "including addressing whether the MPSC's order complied with the Administrative Procedures Act." *In re Reliability Plans of Electric Utilities for 2017-2021*, 505 Mich 97, 129; 949 NW2d 73 (2020). We do so now, and hold that the MPSC neither issued the equivalent of administrative rules in violation of APA procedures, nor otherwise exercised legislative authority in violation of the nondelegation doctrine. We therefore affirm the order of the MPSC.

---

[1] These appeals were consolidated on this Court's own motion. *In re Reliability Plans of Electric Utilities for 2017-2021*, unpublished order of the Court of Appeals, entered November 15, 2017 (Docket Nos. 340600; 340607).

## I. BACKGROUND FACTS

When this case was previously before this Court, we summarized the background facts underlying the appeal as follows:

Michigan's Legislature previously enacted what was known as the Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq.*, as enacted by 2000 PA 141 and 2000 PA 142, to "further the deregulation of the electric utility industry." *In re Application of Detroit Edison Co for 2012 Cost Recovery Plan*, 311 Mich App 204, 207 n 2; 874 NW2d 398 (2015). That act permitted customers to buy electricity from alternative electric suppliers instead of limiting customers to purchasing electricity from incumbent utilities, such as appellee Consumers Energy Company (Consumers). *Consumers Energy Co v Pub Serv Comm*, 268 Mich App 171, 173; 707 NW2d 633 (2005). Among the purposes of the act, as amended by Act 341, is the promotion of "financially healthy and competitive utilities in this state." MCL 460.10(b).

[T]he Midcontinent Independent System Operator (MISO) is the regional transmission organization responsible for managing the transmission of electric power in a large geographic area that spans portions of Michigan and 14 other states. To accomplish this, MISO combines the transmission facilities of several transmission owners into a single transmission system. In addition to the transmission of electricity, MISO's functions include capacity resource planning. MISO has established ten local resource zones; most of Michigan's lower peninsula is located in MISO's Local Resource Zone 7, while the upper peninsula is located in MISO's Local Resource Zone 2.

Each year MISO establishes for each alternative electric supplier in Michigan the "planning reserve margin requirement." MISO also establishes the "local clearing requirement." Under MISO's system, there generally are no geographic limitations on the capacity resources that may be used by a particular supplier to meet its planning reserve margin requirement. That is, MISO does not impose the local clearing requirement on alternative electric suppliers individually but instead applies the local clearing requirement to the zone as a whole. Each individual electricity supplier is not required by MISO to demonstrate that its energy capacity is located within Michigan, as long as the zone as a whole demonstrates that it has sufficient energy generation located within Michigan to meet federal requirements.

MISO also serves as a mechanism for suppliers to buy and sell electricity capacity through an auction. This allows for the exchange of capacity resources across energy providers and resource zones. The MISO auction is conducted each year for the purchase and sale of capacity for the upcoming year. The auction allows suppliers to buy and sell electricity capacity and acquire enough capacity to meet their planning reserve margin requirement. The auction also allows each zone as a whole to meet the zone's local clearing requirement.

At the end of 2016, our Legislature enacted Act 341, in part adding MCL 460.6w, which imposes resource adequacy requirements on electric service providers in Michigan and imposes certain responsibilities on the MPSC. Under MCL 460.6w(2), the MPSC is required under certain circumstances to establish a "state reliability mechanism."

The parties agree that because the Federal Energy Regulatory Commission did not put into effect the MISO-proposed tariff, the MPSC is required by § 6w(2) to establish a state reliability mechanism. A "state reliability mechanism" is defined by the statute as "a plan adopted by the commission in the absence of a prevailing state compensation mechanism to ensure reliability of the electric grid in this state consistent with subsection (8)." MCL 460.6w(12)(h). The state reliability mechanism is to be established consistently with § 6w(8), which . . . requires each alternative electric supplier, cooperative electric utility, and municipally owned electric utility to demonstrate to the MPSC that it has sufficient capacity to meet its "capacity obligations." The statute does not define "capacity obligations," but in § 6w(8)(c), the statute provides that:

> (c) In order to determine the capacity obligations, [the MPSC shall] request that [MISO] provide technical assistance in determining the local clearing requirement and planning reserve margin requirement. If [MISO] declines, or has not made a determination by October 1 of that year, the commission shall set any required local clearing requirement and planning reserve margin requirement, consistent with federal reliability requirements.

Section 6w(8)(b) also provides that municipally owned electric utilities are permitted to "aggregate their capacity resources that are located in the same local resource zone to meet the requirements of this subdivision" and that cooperative electric utilities are permitted to "aggregate their capacity resources that are located in the same local resource zone to meet the requirements of this subdivision." Section 6w(8)(b) also permits a cooperative or municipally owned electric utility to "meet the requirements of this subdivision through any resource, including a resource acquired through a capacity forward auction, that [MISO] allows to qualify for meeting the local clearing requirement." Section 6w(8)(b), however, does not include a similar provision for alternative electric suppliers and is, in fact, silent as to whether alternative electric suppliers may aggregate their capacity resources that are located in the same local resource zone to meet the requirements of the subdivision.

MCL 460.6w(3) directs the MPSC to establish a capacity charge that a provider must pay if it fails to satisfy the capacity obligations established under § 6w(8). Section 6w(6), however, directs that a capacity charge shall not be assessed against an alternative electric supplier who demonstrates "that it can meet its capacity obligations through owned or contractual rights to any resource that [MISO] allows to meet the capacity obligation of the electric provider. . . ."

-4-

After the enactment of Act 341, the MPSC worked collaboratively in a workgroup process to implement MCL 460.6w. On September 15, 2017, the MPSC issued an order in its Case No. U-18197, imposing new requirements on alternative electric suppliers as part of its implementation of MCL 460.6w. In that order, the MPSC determined that MCL 460.6w authorizes it to impose a local clearing requirement on individual alternative electric suppliers. . . . [*In re Reliability Plans*, 325 Mich App at 211-216 (footnotes omitted).]

As noted, ABATE and Energy Michigan appealed the order of the MPSC to this Court, challenging the order as an erroneous interpretation of MCL 460.6w. This Court agreed, and reversed the order of the MPSC. *In re Reliability Plans*, 325 Mich App at 235. The Michigan Supreme Court reversed the judgment of this Court, and remanded the consolidated cases to this Court for further proceedings consistent with the Supreme Court's opinion. *In re Reliability Plans*, 505 Mich at 102, 129,

## II. ANALYSIS

### A. STANDARD OF REVIEW

Whether an agency policy is invalid because it was not promulgated as a rule under the APA is a question of law that we review de novo. *In re PSC Guidelines for Transactions Between Affiliates*, 252 Mich App 254, 263; 652 NW2d 1 (2002). Whether the Nondelegation Clause of the Michigan Constitution has been violated is a question of constitutional interpretation that we also review de novo. See *In re Certified Questions from US Dist Court*, ___ Mich ___, ___; ___ NW2d ___ (2020) (Docket No. 161492); slip op at 4.

### B. THE APA

Energy Michigan contends that the MPSC erred when issuing its order in its Case No. U-18197 because the order essentially promulgates rules without complying with the formal rule-making requirements of the APA. Energy Michigan argues that the MPSC's order essentially enacts rules because it establishes a formula for determining the total capacity obligation for each electric provider, restricts resort to MISO's planning resource auctions for that purpose, and sets the capacity obligations on the basis of a provider's peak load contributions. We conclude that the MPSC did not err by interpreting § 6w of Act 341 as calling for it to implement the provisions of § 6w without resorting to formal rulemaking under the APA.

The promulgation of administrative rules is governed by the APA, *Slis v Michigan*, ___ Mich App ___, ___; ___ NW2d ___ (2020) (Docket Nos. 351211, 351212); slip op at 1, and the MPSC is authorized to promulgate rules under the APA. MCL 460.9(8). Under § 7 of the APA, MCL 24.207, "rule" is defined as:

an agency regulation, statement, standard, policy, ruling, or instruction of general applicability that implements or applies law enforced or administered by the agency, or that prescribes the organization, procedure, or practice of the agency, including the amendment, suspension, or rescission of the law enforced or administered by the agency. . . .

An agency is obligated to employ formal APA rulemaking when establishing policies that "do not merely interpret or explain the statute or rules from which the agency derives its authority," but rather "establish the substantive standards implementing the program." *Faircloth v Family Independence Agency*, 232 Mich App 391, 404; 591 NW2d 314 (1998). A rule that is not promulgated under the APA is invalid and does not have the force of law. MCL 24.243; *Goins v Greenfield Jeep Eagle, Inc*, 449 Mich 1, 10; 534 NW2d 467 (1995).

Excepted from the definition of a "rule" under the APA is a "rule or order establishing or fixing rates or tariffs," MCL 24.207(c), a "determination, decision, or order in a contested case," MCL 24.207(f), an "interpretive statement" or "guideline," MCL 24.107(h), or a "decision by an agency to exercise or not to exercise a permissive statutory power, although private rights or interests are affected," MCL 24.207(j); *In re Reliability Plans*, 325 Mich App at 233. The definition of "rule" under MCL 24.207 is broadly construed to reflect the APA's preference for policy determinations pursuant to rules, while the exceptions are narrowly construed. *AFSCME v Dep't of Mental Health*, 452 Mich 1, 10; 550 NW2d 190 (1996). In addition, an agency may not avoid the requirements for promulgating rules by issuing its directives under different labels. See *id*. at 9.

In this case, we conclude that the MPSC's exercise of authority under § 6w was an exercise of permissive statutory power, and thus not subject to the rulemaking requirements of the APA. See MCL 24.207(j). Section 6w requires the MPSC to establish the format for electric provider resource adequacy filings, and authorizes it to determine local clearing requirements and planning reserve margin requirements for electric providers. Section 6w also calls for contested cases under the circumstances set forth in subsections (1) and (2), and calls for the agency to determine a capacity charge under subsection (3). Subsection (8)(c) requires the MPSC to seek "technical assistance" from MISO "in determining the local clearing requirement and planning reserve margin requirement" for purposes of determining capacity obligations, and subsection (8)(d) requires the PSC to seek such assistance in "assessing resources to ensure that any resources will meet federal reliability requirements."

The Legislature's specification of procedural methodology—contested case proceedings in Subsections (1), (2), and (3), and seeking technical assistance from MISO under Subsection (8)—indicates that, where the Legislature did not specify how to proceed, it expected the MPSC to do so within its own discretion. In addition, what the MPSC refers to as the "compressed timeline that Section 6w presents" suggests that the Legislature did not expect the MPSC to promulgate APA rules in implementing the new legislation.[2] See *Mich Trucking Ass'n v Pub Serv Comm*, 225 Mich App 424, 430; 571 NW2d 734 (1997) (treating the impossibility of promulgating rules within the envisioned timeframe as indicating that the Legislature did not intend to require APA rulemaking). We therefore conclude that § 7(j) of the APA exempts the MPSC from

---

[2] The Office of Regulatory Reinvention's Rules Tracking Time Frame Report, p 9, provides that the process for promulgating rules by entities within the Department of Licensing & Regulatory Affairs averages 572 days. Because it would be impossible for the MPSC to promulgate rules to determine annual capacity obligations with a rulemaking process that takes more than one year to accomplish, logic dictates that the Legislature did not intend the agency to use that procedure.

implementing § 6w of Act 341 by resort to the rule-making procedures of the APA. This conclusion is further supported by the fact that § 6w does not specifically require the MPSC to promulgate rules before undertaking the tasks assigned to it under that section. See *Mich Trucking Ass'n*, 225 Mich App at 430.

## C. NONDELEGATION DOCTRINE

ABATE contends that the MPSC's exercise of authority under § 6w of Act 341 runs afoul of Michigan's nondelegation doctrine, which prohibits the Legislature from delegating policy-making authority to the Executive without meaningful standards or guiding principles. We disagree.

Michigan's Constitution provides that "[t]he legislative power of the State of Michigan is vested in a senate and a house of representatives." Const 1963, art 4, § 1. Our state Constitution further declares that no person "exercising the powers of one branch" of state government "shall exercise powers properly belonging to another except as expressly provided in this constitution." Const 1963, art 3, § 2. "These constitutional provisions have led to the constitutional discipline that is described as the nondelegation doctrine." *Taylor v Gate Pharmaceuticals*, 468 Mich 1, 8; 658 NW2d 127 (2003). "One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority." *In re Certified Questions*, ___ Mich at ___; slip op at 12, quoting Cooley, Constitutional Limitations (1886), pp 116-117. As noted, we review de novo whether the Nondelegation Clause of the Michigan Constitution has been violated. See *In re Certified Questions*, ___ Mich at ___; slip op at 4. "Statutes are presumed to be constitutional, and we have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Id*. (quotation marks and citations omitted).

Although the Legislature may not delegate its legislative power to the executive branch, the Legislature may delegate a task to an executive branch agency if the Legislature provides "sufficient standards." *Taylor*, 468 Mich at 10 n 9. If sufficient standards accompany the delegation it is transformed into a proper exercise of executive power. See *Blue Cross & Blue Shield v Governor*, 422 Mich 1, 51-55; 367 NW2d 1 (1985). In other words, the Legislature's delegation of authority to an administrative agency is proper only when the controlling statute provides the agency with standards sufficient to turn the agency's decision from a legislative decision into an executive decision. *Taylor*, 468 Mich at 10 n 9.

In determining whether a statute contains sufficient standards, "we must be mindful of the fact that such standards must be sufficiently broad to permit efficient administration in order to properly carry out the policy of the Legislature but not so broad as to leave the people unprotected from uncontrolled, arbitrary power in the hands of administrative officials." *In re Certified Questions*, ___ Mich at ___; slip op at 13, quoting *Dep't of Natural Resources v Seaman*, 396 Mich 299, 308-309; 240 NW2d 206 (1976).

In evaluating legislative standards in the context of the nondelegation doctrine, our Supreme Court has explained that "(1) the act must be read as a whole; 2) the act carries a presumption of constitutionality; and 3) the standards must be as reasonably precise as the subject matter requires or permits." *Blue Cross & Blue Shield*, 422 Mich at 51. "The preciseness of the

standards will vary in proportion to the degree to which the subject regulated requires constantly changing regulation." *Associated Builders & Contractors v Dep't of Consumer & Industry Servs Dir (On Remand)*, 267 Mich App 386, 391; 705 NW2d 509 (2005). The focus is "whether the *degree* of generality contained in the authorization for exercise of executive or judicial powers in a particular field is so unacceptably high as to *amount* to a delegation of legislative powers." *In re Certified Question*, ___ Mich at ___; slip op at 13, quoting *Mistretta v United States*, 488 Mich 361, 419; 109 S Ct 647; 102 L Ed 2d 714 (1989) (SCALIA, dissenting). Thus, the question is whether the Legislature "supplied an intelligible principle to guide the delegee's use of discretion. . . . [T]he answer requires construing the challenged statute to figure out what task it delegates and what instructions it provides." *In re Certified Question*, ___ Mich at ___; slip op at 13, quoting *Gundy v United States*, 588 US ___, ___; 139 S Ct 2116, 2123; 204 L Ed 2d 522 (2019) (opinion by KAGAN, J.).

In this case, ABATE contends that the Legislature's directive to the MPSC in § 6w of Act 341 is not accompanied by sufficiently precise standards, and thus runs afoul of the nondelegation doctrine. Specifically, ABATE argues that the Legislature in § 6w directs the MPSC to adopt a "state reliability mechanism" defined by the act as a "plan . . . to ensure reliability of the electric grid in this state. . . ." MCL 460.6w(12)(h). ABATE further argues that the Legislature requires all electric providers in Michigan to "demonstrate to the commission, in a format determined by the commission, that . . . [each electric provider has] sufficient capacity to meet its capacity obligations as set by the [MISO], or commission, as applicable." MCL 460.6w(8)(a). ABATE argues that because the statute does not define "capacity" or "capacity obligation," and also does not direct how to establish the capacity demonstration process, the Legislature provided insufficient standards.

We disagree that the statute provides insufficient standards. On the contrary, § 6w defines the scope and nature of the MPSC's review and sets standards directing the authority of the MPSC in some detail. For example, § 6w(12)(h) defines "state reliability mechanism" and § 6w(8) outlines numerous responsibilities of the MPSC if a state reliability mechanism is required under § 6w(2). Section 6w(8)(c) provides direction to the MPSC to determine capacity obligations by requesting technical assistance from the appropriate independent system operator in determining the local clearing requirement and the planning reserve margin requirement, terms defined by the statute, and otherwise to set those requirements consistent with federal reliability requirements. MCL 460.6w(8)(c).

As noted, in determining whether a statute contains sufficient standards we are mindful that although the standards cannot be so broad as to permit uncontrolled, arbitrary power in the hands of administrative officials, they must be sufficiently broad to permit efficient administration to properly carry out the policy of the Legislature. *In re Certified Questions*, ___ Mich at ___; slip op at 13. Given that the preciseness of the standards by necessity varies with whether the subject being regulated requires constantly changing regulation, *Associated Builders (On Remand)*, 267 Mich App at 391, and given that the Legislature is presumed not to delegate the authority to act unreasonably, *In re Certified Questions*, ___ Mich at ___; slip op at 16, we conclude that the standards provided were not so general as to amount to a delegation of legislative powers. See *id.* at ___; slip op at 13.

Affirmed.

/s/ Patrick M. Meter
/s/ Michael F. Gadola
/s/ Jonathan Tukel