*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

*In re* APPLICATION OF INDIANA MICHIGAN POWER COMPANY.

---

MICHIGAN PUBLIC SERVICE COMMISSION
and ATTORNEY GENERAL,

      Appellees,

v

INDIANA MICHIGAN POWER COMPANY,

      Appellant.

FOR PUBLICATION
January 18, 2024
9:05 a.m.

No. 365180
PSC
LC No. 00-020530

---

Before: GARRETT, P.J., and LETICA and MALDONADO, JJ.

PER CURIAM.

Appellant, Indiana Michigan Power Company (I&M), appeals as of right a final order entered by appellee Michigan Public Service Commission (PSC). I&M had filed for a power-supply-cost-recovery (PSCR) reconciliation, and the PSC approved the majority of requested costs. But, the PSC denied the portion of costs associated with a power-purchase agreement that I&M executed in 1952, then extended in 2004 and 2010. On appeal, I&M alleges that the PSC exceeded its authority, acted unlawfully, and interfered with I&M's contractual rights by applying certain administrative rules to deny costs I&M sought to recover by way of the reconciliation proceedings. Primarily, I&M disputes whether the Code of Conduct, a set of administrative rules promulgated by the PSC, applies to the power-purchase agreement at issue and whether, by applying this code, the PSC exceeded its authority under the code's enabling statute. We conclude that the PSC properly applied the Code of Conduct to the agreement at issue and that this code is in accordance with its enabling statute. Accordingly, we affirm.

## I. FACTS

### A. GENERAL BACKGROUND INFORMATION

Michigan utilities are prohibited from supplying power to customers at higher prices than those by which the power is obtained, and MCL 460.6j allows a utility to recover expended power-supply costs as long as they are deemed to be reasonable. MCL 460.6j(2) provides that the PSC may incorporate a "PSCR clause" in the rate schedule of an electric utility. A PSCR clause is

> a clause in the electric rates or rate schedule of an electric utility that permits the monthly adjustment of rates for power supply to allow the utility to recover the booked costs, including transportation costs, reclamation costs, and disposal and reprocessing costs, of fuel burned by the utility for electric generation and the booked costs of purchased and net interchanged power transactions by the utility incurred under reasonable and prudent policies and practice. [MCL 460.6j(1)(b).]

The utility's "plan" for the year will set forth its expected sales and propose a per-unit cost, the "PSCR factor," that it wishes to charge. MCL 460.6j(1)(c) and (3). The PSC then establishes the PSCR factor in a contested-case proceeding. MCL 460.6j(5). After the end of the year, the projected calculation of costs is reconciled with the *actual collection* of costs in a PSCR "reconciliation," and the PSC determines if the utility has acquired power in a reasonable and prudent manner. MCL 460.6j(12)-(16). If the PSC finds that the utility has "overrecovered," the utility must refund or credit the overcollection, plus interest. MCL 460.6j(14) and (16). If there is an "underrecovery," the utility may surcharge its customers and recover interest. MCL 460.6j(15) and (16).

### B. INITIAL PRESENTATION OF CASE

In March 2021, I&M filed an application requesting that the PSC begin a PSCR reconciliation for the 12-month period ending December 31, 2020. I&M sells electricity in Michigan and Indiana and is a wholly-owned subsidiary of American Electric Power Company, Inc. (AEP). In the application, I&M requested that the PSC "approve I&M's reconciliation of its power supply costs, revenues, and interest for January through December 2020, and determine that the power supply costs as presented in this reconciliation filing were reasonably and prudently incurred." It also sought authorization to "roll-in the net actual under-recovered principal and interest" in the amount of $5,386,708.

During the contested case, the Attorney General (AG) presented testimony from Devi Glick, an energy consultant, who evaluated I&M's request to recover, by way of the PSCR reconciliation, expenses paid to the Ohio Valley Electric Corporation (OVEC) for power obtained from OVEC units under an agreement called the Inter-Company Power Agreement (ICPA). Glick explained that OVEC is owned by 12 utilities in six states and supplies power from two coal-fired plants located in Ohio and Indiana. OVEC provides power to the utilities by way of the ICPA, a long-term contract. Glick advised that "I&M's share of the ICPA with OVEC is 7.85 percent. . . . This means that I&M is responsible for 7.85 percent of OVEC's fixed and variable costs while also being entitled to a 7.85 percent share of OVEC's power output." She said that "[t]he cost of the ICPA is passed through to I&M ratepayers as a direct cost."

Glick also testified that I&M has been purchasing power from OVEC, an affiliate company, at above-market value with those costs passed on to customers. Glick opined that OVEC operated two power plants in an uneconomic manner, causing it to incur net losses relative to market energy prices. It was asserted that I&M customers would have been better off if the OVEC plants had not operated at all in 2020. Glick opined that these losses could be mitigated with more prudent unit commitment practices.

It was recommended that the PSC disallow $3.7 million in connection with I&M's payment for OVEC services under the ICPA. Glick averred that this amount represented "Michigan's jurisdictional share of the total $26.5 million in excess compensation that I&M paid for OVEC services under the ICPA (relative to the market value of the services)."

Glick testified that the PSC had already found that OVEC is an affiliate of I&M. She also noted that the PSC had found that neither the original ICPA nor its 2004 and 2010 extensions had ever been approved by the PSC and that the agreement was now set to last until 2040. In support of these assertions, she cited the PSC's order in *In re Application of Indiana Michigan Power Co*, order of the Public Service Commission, entered May 13, 2021 (Case No. U-20529). This was the "rate case"[1] order pertaining to I&M's proposed plan for 2020. And in that order, the PSC ruled that I&M and OVEC are affiliates and also ruled that it had never reviewed the ICPA or its amendments. *Id*. at pp 13, 17.

The term "affiliate" derives from Rule 2 of the Code of Conduct, Mich Admin Code 460.10101 *et seq*.; Rule 2 is set forth in Mich Admin Code, R 460.10102. Mich Admin Code, R 460.10102(1)(a) states:

> "Affiliate" means a person or entity that directly or indirectly through 1 or more intermediates, controls, is controlled by, or is under common control with another specified entity. As used in these rules, "control" means, whether through an ownership, beneficial, contractual, or equitable interest, the possession, directly or indirectly, of the power to direct or to cause the direction of the management or policies of a person or entity or the ownership of at least 7% of an entity either directly or indirectly.

Glick stated, "If I&M can purchase the energy, capacity, or ancillary services that it needs from the PJM market [the Pennsylvania-New Jersey-Maryland Interconnection, a general energy market[2]] at a lower cost than it would pay to purchase power from OVEC under the ICPA, then it

---

[1] As noted, a utility files for a proposed rate each year and then files for a reconciliation.

[2] A witness explained:

> PJM is a Regional Transmission Organization that is mandated by FERC [the Federal Regulatory Energy Commission] to provide reliable supplies of power, adequate transmission infrastructure, and competitive wholesale prices of electricity. PJM operates markets for capacity, energy, and ancillary services. The capacity markets include annual auctions for capacity while the energy markets

is paying above the market price for the OVEC power." Glick explained that I&M was paying above market price for OVEC power, "[i]n every month [of 2020], I&M customers were billed substantially more for OVEC power than I&M would have received from the PJM market for OVEC's equivalent levels of capacity, energy, and ancillary services." She advised that end-use customers would have been better off if I&M had simply purchased the OVEC-derived energy from the PJM market.

Glick noted that, despite discovery requests, I&M had not provided any comparators for determining the value of the energy provided by OVEC, and, therefore, had "left it to the Commission to determine an appropriate benchmark." She stated that the power cost under the ICPA was "much higher" than the cost under similar power-purchase agreements in the region. Glick determined that "[t]he power I&M purchased under the ICPA is extremely high cost by any reasonable measure."

The PSC staff submitted testimony and exhibits from Wendy Chanter and Lisa Kindschy. Kindschy, a public-utilities-engineering specialist, addressed Case No. U-20529 (the 2020 I&M rate case) and explained that the PSC, in its order for that case, referred to Mich Admin Code, R 460.10108 ("Rule 8"), a provision of the Code of Conduct. Rule 8 states, in part:

> If a utility provides services or products to any affiliate or other entity within the corporate structure, and the cost of the service or product is not governed by section 10ee(8) of 2016 PA 341, MCL 460.10ee(8), compensation is based upon the higher of fully allocated embedded cost or fair market price. *If an affiliate or other entity within the corporate structure provides services or products to a utility, and the cost of the service or product is not governed by section 10ee(8) of 2016 PA 341, MCL 460.10ee(8), compensation is at the lower of market price or 10% over fully allocated embedded cost. . . .* [Mich Admin Code, R 460.10108(4) (emphasis added).]

In turn, MCL 460.10ee(8) provides:

> All utility costs directly attributable to a value-added program or service allowed under this section shall be allocated to the program or service as required by this section. The direct and indirect costs of all utility assets used in the operation of the program or service shall be allocated to the program or service based on the proportional use by the program or service as compared to the total use of those assets by the utility. The cost of the program or service includes administrative and general expense loading to be determined in the same manner as the utility determines administrative and general expense loading for all of the utility's regulated and unregulated activities.

include both Day-Ahead and Real-Time markets. The ancillary services markets are each designed to address regulation-related and reserve-related ancillary services.

Finally, MCL 460.10ee(16)(b) states:

> "Value-added programs and services" means programs and services that are utility or energy related, including, but not limited to, home comfort and protection, appliance service, building energy performance, alternative energy options, or engineering and construction services. Value-added programs and services do not include energy optimization or energy waste reduction programs paid for by utility customers as part of their regulated rates.

In Case No. U-20529, p 17, the PSC stated:

> . . . I&M will be required to demonstrate that the amended ICPA, an affiliate contract, is in compliance with the pricing provisions under Rule 8(4). The Commission previously held that a utility "does have an ongoing obligation to demonstrate compliance with the pricing provisions of the Code of Conduct in the [PSCR] reconciliation, which in turn will provide the Commission with the required information to determine the amount of affiliate transaction costs" that may be recovered.[3]

Kindschy explained that in I&M's 2019 PSCR reconciliation order, the PSC did not look solely at market comparisons when evaluating I&M's dealings with OVEC and instead took into account the long-term ICPA. Therein, the PSC noted that the arrangement with OVEC was likely not going to be cost-effective into the future and that I&M was under a continuing obligation to demonstrate the reasonableness and prudence of its arrangements for obtaining power. Kindschy stated that "the Commission found that the OVEC ICPA resulted in positive net energy revenues for customers in 2019 and therefore no disallowance was warranted related to the market pricing provision in Rule 8(4) of the Code of Conduct." Kindschy added, however, that because of the COVID-19 pandemic, energy demand was down in 2020, and she and Chanter had, accordingly, concluded that an ICPA-related disallowance of $306,391 of I&M's requested costs would be appropriate for 2020.[4]

A rebuttal witness presented by I&M opined that Glick, in evaluating the ICPA, had looked to market prices only during the review period and had not offered any insight "into the prudence of the[] agreement[] or of the value and prudence of the underlying assets." He contended that Glick did not make proper comparisons and improperly ignored when the contract was executed.

At a hearing in October 2021, I&M's primary witness admitted that I&M had not submitted market-value comparators aside from discussing the company's "own resources." He was asked, "[F]or evaluating whether affiliate transactions comply with [the] market price cap and the Code of Conduct for the MPSC[,] . . . [d]on't we have to compare them to something?" He replied, "I am by no means an expert on the Michigan Code of Conduct. I would assume so." It was elicited

---

[3] Whether Rule 8(4) applies in this case is a primary dispute in this appeal.

[4] But she explained that, alternatively, the PSC could opt to allow all of I&M's requested costs in light of the pandemic's effects.

at the hearing that I&M had been asked to provide details regarding the costs associated with the ICPA (such as how often the coal plants were run, etc.) and that I&M did not provide such details.

In her brief below, the AG contended that I&M needed to comply with Rule 8(4) of the Code of Conduct because an affiliate transaction was at issue when I&M received power from OVEC. The AG cited to the 2020 I&M rate case addressed by witnesses and noted that the PSC had already ruled that the Code of Conduct was applicable. She also observed that, in the 2021 I&M rate case, the PSC again ruled that OVEC is an affiliate of I&M, that the Code of Conduct applied, and that I&M had never presented the ICPA to the PSC for approval. The AG referred to witness testimony concerning how much above market pricing the energy costs under the ICPA were for 2020 and emphasized that I&M provided no comparables to contest proposed market-price figures.

I&M, in its initial brief below, noted that Kindschy, a PSC staff member, recommended either no offset with regard to the ICPA or a comparatively small one. It also argued that with a long-term contract, one must take the "bad" years with the "good" in exchange for a predictable rate. And, in its reply brief, I&M argued that the Code of Conduct simply does not apply in a PSCR reconciliation proceeding, and disallowance was premised on the reasonable and prudent standard.

## C. PROPOSAL FOR DECISION AND EXCEPTIONS

An administrative law judge (ALJ) issued a proposal for decision and rejected I&M's assertion that 2020 PJM market pricing should not be used in assessing losses. He noted that, in a prior case, I&M had made a contrary argument. He also concluded that, under Rule 8(4), market pricing needed to be considered, stating, "Both the reasonableness standard and Rule 8(4) are specifically meant to protect ratepayers by ensuring that utility transactions are commensurate with the then-current market conditions." The ALJ determined that the Code of Conduct and 1982 PA 304 (Act 304) were to be interpreted in harmony with one another. It was concluded that I&M and OVEC were, indeed, affiliates. He also noted that, with regard to three comparables relied upon by the AG to reach her disallowance amount, I&M had offered no alternative method of interpreting the comparables.

The ALJ proposed that "appropriate disallowances be ordered based upon the long-term cost comparisons offered by the [AG]." He stated that "the power transaction costs are the most appropriate for comparison purposes" and recommended the following disallowance:

$1.347 million of the ICPA costs, calculated as the difference between the ICPA total cost of $65.46 per MWh and the average ($52.02 per MWh) of the MPPA-DTE Belle River transaction cost ($55.16 per MWh) and the Consumers-MCV transaction cost ($48.49), multiplied by the 721,476 MWh of electricity billed in 2020, reduced for the Michigan share (13.9%) of the costs.

D.  PSC'S RULING

The PSC adopted the ALJ's proposal for decision, noting it had already concluded, in Case No. U-20529, that I&M and OVEC were affiliates.  And, it had also previously ruled that "I&M would be required to demonstrate that the amended ICPA, an affiliate contract, is in compliance with the pricing provisions of Rule 8(4)."  It further stated that, in a December 9, 2020 order, it ruled that proper management of existing contracts might entail meaningful attempts to renegotiate contract provisions in response to market fluctuations.  The PSC stated:

> Based on the previous decisions of the Commission and the evidence presented in this proceeding, the Commission agrees that the ALJ's recommended disallowance of $1.347 million is appropriate.  The Commission agrees that cost comparison of prior power transaction costs are the fairest benchmarks for calculating the disallowance.  As it pertains to I&M's arguments regarding the Attorney General's comparisons, the Commission notes that it would be difficult to produce comparisons that are 100% identical to the OVEC units.  However, as the Attorney General demonstrated, comparisons can be made and the failure of I&M to provide the Commission with meaningful benchmarks when repeatedly directed to do so is not well taken.

The PSC also stated that because the ICPA had never been approved by the Commission, "each time associated costs are submitted, they must be reviewed for reasonableness and prudence."  The PSC then stated that "[t]he very purpose of the Commission's Code of Conduct is to protect customers from exactly this type of arrangement, namely where a utility contracts with an affiliate for above-market-cost power to the detriment of its customers."  Moreover, the PSC agreed

> with the Attorney General that Act 304 and the Code of Conduct must be read in harmony, and the fact that I&M must meet the standards of Act 304 for all of its PSCR costs, and must meet Code of Conduct requirements for costs incurred with affiliates, does not mean that the Code of Conduct conflicts with PSCR statutes.

II.  ANALYSIS

A.  STANDARDS OF REVIEW

As stated in *In re Application of Consumers Energy Co for Gas Cost Recovery*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 356330); slip op at 8:

> "A final order of the PSC must be authorized by law and be supported by competent, material, and substantial evidence on the whole record."  *In re Application of Consumers Energy Co to Increase Rates*, 338 Mich App 239, 242; 979 NW2d 702 (2021), citing Const 1963, art 6, § 28.  An aggrieved party must "show by clear and satisfactory evidence that the order of the [PSC] complained of is unlawful or unreasonable."  MCL 462.26(8).  [Brackets in original.]

Also:

> To establish that a PSC order is unlawful, the appellant must show that the PSC failed to follow a statutory requirement or abused its discretion in the exercise of its judgment. A reviewing court gives due deference to the PSC's administrative expertise, and is not to substitute its judgment for that of the PSC. [*In re Application of Consumers Energy Co to Increase Rates*, 338 Mich App at 242 (citation omitted).]

In addition:

> "Issues of statutory interpretation are reviewed de novo." *Id*. at 243, citing *In re Complaint of Rovas*, 482 Mich 90, 102; 754 NW2d 259 (2008). "A reviewing court should give respectful consideration to an administrative agency's interpretation of statutes it is obliged to execute, but not deference." [*Id*.]

> An order of the PSC "is unreasonable if it is not supported by the evidence." *In re Implementing Section 6w of 2016 PA 341 for Cloverland Electric Coop*, 329 Mich App 163, 175; 942 NW2d 38 (2019) (quotation marks and citation omitted). The PSC's findings of fact are entitled to deference. *In re Complaint of Rovas*, 482 Mich at 101. [*In re Application of Consumers Energy Co for Gas Cost Recovery*, ___ Mich App at ___; slip op at 8.]

Finally, as stated in *City of Romulus v Mich Dep't of Environmental Quality*, 260 Mich App 54, 65; 678 NW2d 444 (2003):

> Principles of statutory interpretation apply to the construction of administrative rules. Thus, [this Court] must ascertain and give effect to the intent of the drafter of the statute or administrative rule under review. [This Court] start[s] by reviewing the language of the administrative rule or statute. If the language is unambiguous on its face, the drafter is presumed to have intended the meaning plainly expressed and further judicial interpretation is not permitted. [Citations omitted.]

## B. DISCUSSION

MCL 460.6j(12) states:

> Not less than once a year, and not later than 3 months after the end of the 12-month period covered by an electric utility's power supply cost recovery plan, the commission shall commence a proceeding, to be known as a power supply cost reconciliation, as a contested case pursuant to chapter 4 of the administrative procedures act of 1969, 1969 PA 306, MCL 24.271 to 24.287. The commission shall permit reasonable discovery before and during the reconciliation proceeding in order to assist parties and interested persons in obtaining evidence concerning reconciliation issues including, but not limited to, the reasonableness and prudence of expenditures and the amounts collected pursuant to the clause. At the power supply cost reconciliation the commission shall reconcile the revenues recorded

-8-

pursuant to the power supply cost recovery factors and the allowance for cost of power supply included in the base rates established in the latest commission order for the utility with the amounts actually expensed and included in the cost of power supply by the utility. *The commission shall consider any issue regarding the reasonableness and prudence of expenses* for which customers were charged if the issue was not considered adequately at a previously conducted power supply and cost review. [Emphasis added.]

MCL 460.6j(13) lists certain actions the PSC *must* take, such as the disallowance of "increases in charges for nuclear fuel disposal unless the utility has received the prior approval of the commission." MCL 460.6j(13)(j). I&M notes that MCL 460.6j(13) does not refer to the Code of Conduct or to a disallowance based on long-term contracts that fail to align with market conditions. It submits that the ICPA disallowance was, therefore, improper. However, that subsection only lists mandatory actions; the Commission maintains the discretion for the reconciliation under the reasonableness and prudence standards set forth in other subsections. Subsection 12 refers to the PSC's consideration of "*any issue* regarding the reasonableness and prudence of expenses for which customers were charged if the issue was not considered adequately at a previously conducted power supply and cost review." MCL 460.6j(12) (emphasis added); see also MCL 460.6j(14) and (15).

I&M further contends that the issue concerning the ICPA was already considered at the plan stage and that, therefore, the Commission exceeded its authority by disallowing costs in this recovery proceeding. But the statute refers to whether an issue was *adequately* considered. In the plan order, the Commission stated that it was not going to issue a warning under MCL 460.6j(7) that I&M would likely be unable to recover ICPA costs in the future. Case No. U-20529, p 18. MCL 460.6j(7) states:

In its final order in a power supply and cost review, the commission shall evaluate the decisions underlying the 5-year forecast filed by a utility under subsection (4). The commission may also indicate any cost items in the 5-year forecast that, on the basis of present evidence, the commission would be unlikely to permit the utility to recover from its customers in rates, rate schedules, or power supply cost recovery factors established in the future.

The statutory scheme simply fails to indicate that if such a warning is not given regarding particular costs, the Commission is prohibited from disallowing such costs at the reconciliation proceeding. The Commission stated in the plan order:

However, on a going forward basis, the Commission will closely scrutinize costs incurred under this contract between affiliates, reminds I&M of its obligations under the Code of Conduct, including I&M's continuing duty to support its long-term contracts and affiliate transactions, and will expect to see evidence that the company has taken steps to minimize the cost of [power], including efforts to renegotiate contracts, and will look to comparisons with other long-term supply options as informative as to whether this particular contract adheres to the requirements of the Code of Conduct. [Case No. U-20529, pp 18-19 (quotation marks and citation omitted; brackets in original).]

-9-

The Commission also stated:

> The inclusion of a comprehensive analysis regarding the ICPA with the company's 2021 [Integrated Resource Plan], including a sensitivity with and without energy and capacity purchased under the ICPA, along with a model of optimized resources to replace the ICPA resources, will further inform the Commission in its review of costs associated with the ICPA in future PSCR proceedings. [Case No. U-20529, p 19 (quotation marks and citation omitted).]

One could interpret this latter paragraph to mean that the Commission was not going to revisit the ICPA until the 2021 plan was submitted by I&M. The Commission did not state this explicitly, but it did state that "I&M will be required to demonstrate that the amended ICPA, an affiliate contract, is in compliance with the pricing provisions under Rule 8(4)," and it warned of close scrutiny "on a going forward basis." Case No. U-20529, pp 17-18. Therefore, we conclude it was acceptable for the PSC to implicitly find that the issue of the ICPA "was not considered adequately at a previously conducted power supply and cost review," MCL 460.6j(12).

Nonetheless, I&M contends that the standards of reasonableness and prudence cannot be harmonized with the Code of Conduct and that the PSC improperly replaced the reasonable-and-prudent test with the bright-line standard from the Code of Conduct. We disagree. Again, Rule 8 states, in part:

> If an affiliate[5] or other entity within the corporate structure provides services or products to a utility, and the cost of the service or product is not governed by section 10ee(8) of 2016 PA 341, MCL 460.10ee(8), compensation is at the lower of market price or 10% over fully allocated embedded cost. . . . [Mich Admin Code, R 460.10108(4).]6

The rule and the statute can be easily harmonized. As aptly stated by the PSC, "The fact that a utility must meet the standards of Act 304 for all of its PSCR costs and must also meet the Code

---

5 I&M does not argue on appeal, as it did below, that it and OVEC are not affiliates.

6 Mich Admin Code, R 460.10101 states:

> These rules apply to all utilities and alternative electric suppliers subject to the jurisdiction of the commission and the requirements of these rules under section 10ee of 2016 PA 341, MCL 460.10ee. These rules do not apply to a utility with fewer than 150 customers.

And Mich Admin Code, R 460.10102(1)(f) defines "[u]tility," in part, as "an electric, steam, or natural gas utility regulated by the public service commission[.]" Finally, Mich Admin Code, R 460.10103(3) states that "[a] utility's regulated services shall not subsidize the business of its affiliates, other entities within the corporate structure, or third-party contractors offering unregulated value-added programs or services."

of Conduct for any of its PSCR costs incurred with affiliates, does not mean that the Code of Conduct conflicts with the PSCR statute." "It is well recognized that expenses incurred in transactions between utilities and their affiliates deserve special scrutiny, given the potential lack of arms-length bargaining . . . ." *Midland Cogeneration Venture Ltd Partnership v Pub Serv Comm*, 199 Mich App 286, 313; 501 NW2d 573 (1993). I&M states that the Commission did not indicate which decisions made by I&M were unreasonable and imprudent, given that the ICPA and its extensions were entered into years prior. However, the application of Rule 8(4) provides, in essence, for an automatic finding of unreasonableness once rates reach a certain level. Yet, the Commission's actions operated to protect ratepayers by shifting the high costs from 2020 onto I&M's shareholders. The Commission is charged with protecting ratepayers. See *In re Complaint of Mich Cable Telecom Ass'n*, 241 Mich App 344, 370 n 8; 615 NW2d 255 (2000). In addition, the Commission's order advised of its previous statements, addressing a utility's obligation to monitor and respond to market conditions, noting that this might include meaningful attempts to renegotiate contracts.

I&M also contends that the Code of Conduct applies only to so-called value-added programs and services (VAPS) such as appliance-repair programs and not to affiliated energy suppliers.[7] But, this assertion is belied by the plain language of Rule 8(4), which simply addresses "services or products." We note that Rule 8(4) provides an exception for utility-run VAPS by stating that they are excluded from the subrule.[8] Also, the Code of Conduct states:

---

[7] Mich Admin Code, R 460.10102(1)(g) states:

> "Value-added programs and services" means programs and services that are utility or energy related, including, but not limited to, home comfort and protection, appliance service, building energy performance, alternative energy options, or engineering and construction services. Value-added programs and services do not include energy optimization or energy waste reduction programs paid for by utility customers as part of the regulated rates.

[8] Again, MCL 460.10ee(8) states:

> All utility costs directly attributable to a value-added program or service allowed under this section shall be allocated to the program or service as required by this section. The direct and indirect costs of all utility assets used in the operation of the program or service shall be allocated to the program or service based on the proportional use by the program or service as compared to the total use of those assets by the utility. The cost of the program or service includes administrative and general expense loading to be determined in the same manner as the utility determines administrative and general expense loading for all of the utility's regulated and unregulated activities.

The commission may review records relating to any transaction between a utility and an affiliate, *or* relating to the offering of unregulated value-added programs and services. At any time, the commission may initiate an investigation into transactions between the utility and its affiliates, or into its offering of value-added programs and services. [Mich Admin Code, R 460.10104(2) (emphasis added).]

The above provisions demonstrate that the code was intended to address more than just VAPS.

I&M also takes issue with the Code of Conduct's enabling statute—i.e., MCL 460.10ee—seemingly alleging that the enactment of the Code of Conduct itself was improper when viewed in light of the enabling statute.[9] Yet, I&M acknowledges that "the Commission may have authority to enact the Code of Conduct." And it does not make any explicit argument that the Code of Conduct or any rule within it must be invalidated.

Further, we reject I&M's reliance on *In re Application of Consumers Energy Co to Increase Rates*, 339 Mich App 233; 981 NW2d 525 (2021), and conclude that *Detroit Edison Co v Mich Pub Serv Comm*, 261 Mich App 1; 680 NW2d 512 (2004), vacated in part 472 Mich 897 (2005), is dispositive of the issue. In that case, this Court concluded that the prior enabling statute for the Code of Conduct granted "the PSC broad authority over all matters pertaining to public utilities." *Id.* at 9. That enabling statute provided:

Within 180 days after the effective date of the amendatory act that added this section, the commission shall establish a code of conduct that shall apply to all electric utilities. The code of conduct shall include, but is not limited to, measures to prevent cross-subsidization, information sharing, and preferential treatment, between a utility's regulated and unregulated services, whether those services are provided by the utility or the utility's affiliated entities. The code of conduct established under this subsection shall also be applicable to electric utilities and alternative electric suppliers consistent with section 10, this section, and sections 10b through 10bb. [Former MCL 460.10a(4); see also *Detroit Edison Co*, 261 Mich App at 5 (footnote omitted).][10]

---

[9] "The PSC possesses no 'common law' powers; it is a creature of the Legislature and all of its authority must be found in statutory enactments." *Miller Bros v Pub Serv Comm*, 180 Mich App 227, 232; 446 NW2d 640 (1989).

[10] MCL 460.10ee(1) provides:

The commission shall establish a code of conduct that applies to all utilities. The code of conduct shall include, but is not limited to, measures to prevent cross-subsidization, preferential treatment, and, except as otherwise provided under this section, information sharing, between a utility's regulated electric, steam, or natural gas services and unregulated programs and services, whether those services are

The appellant argued that the Code of Conduct had limited application, but this Court rejected the assertion, stating:

> The purposes of Act 141 [i.e., the enabling statute] relate to the generation and supply of electric power and all other matters within the traditional and untraditional roles of the appellants. Here, the PSC interpreted MCL 460.10a(4) by enacting a code of conduct that controls regulated and unregulated services. We find that in so doing, the PSC was fulfilling its legislative mandate. We find that the PSC did not abuse its discretion in holding that it was granted broad authority to enact a code of conduct to govern services unrelated to retail open access. *We find that the PSC was correct in asserting that the Legislature used expansive language to describe the scope of the code of conduct. Because of this expansive language, it follows that the Legislature intended to allow the PSC to adopt the challenged code of conduct.* [*Detroit Edison Co*, 261 Mich App at 9-10 (emphasis added).]

The Supreme Court vacated the part of this Court's opinion in which this Court concluded that the Code of Conduct could be enacted by way of an order in a contested case as opposed to being enacted through rulemaking procedures. *Detroit Edison Co v Mich Pub Serv Comm*, 472 Mich 897; 695 NW2d 336 (2005). The Supreme Court stated, "Further, the issue addressed in Part II(B) of the Court of Appeals opinion [i.e., the issue pertaining to rulemaking] is now moot in light of 2004 PA 88, in which the Legislature amended MCL 460.10a(5) and ratified the code of conduct established by the Public Service Commission." *Id*.[11] As of 2001, the Code of Conduct already stated, in part:

> If an affiliate or other entity within the corporate structure provides services, products, or property to an electric utility or alternative electric supplier offering regulated service in Michigan, compensation for services and supplies shall be at the lower of market price or 10% over fully allocated embedded cost and transfers

---

> provided by the utility or the utility's affiliated entities. The code of conduct established under this section is also applicable to electric utilities and alternative electric suppliers consistent with sections 10 through 10cc.

[11] The version of MCL 460.10a(5) enacted by 2004 PA 88 stated:

> An electric utility may offer its customers an appliance service program. Except as otherwise provided by this section, the utility shall comply with the code of conduct established by the commission under subsection (4). As used in this section, "appliance service program" or "program" means a subscription program for the repair and servicing of heating and cooling systems or other appliances.

of assets shall be based upon the lower of fully allocated embedded cost or market price.[12]

The 2001 Code of Conduct also stated that a service was "regulated" if "the commission has the authority to set the price for the service as of the effective date of this code."[13]

This series of events is indicative of this Court's approval of appellees' interpretation of the Code of Conduct in the present case and specifically of their assertion that the code complies with the enabling statute. To the extent that *In re Application of Consumers Energy Co to Increase Rates*, 339 Mich App 233, could be read to conflict with this conclusion, under the first-out rule of MCR 7.215(J)(1),[14] this Court's opinion in *Detroit Edison Co* would take precedence. The Supreme Court's decision in *Detroit Edison Co* would also take precedence.

I&M further contends that the Commission is encouraging I&M to breach its contract with OVEC. We disagree.

In fact, the Commission was simply following the pertinent statutes and rules, and in doing so protecting ratepayers from the risks of affiliate transactions. Also, in *Consumers Power Co v Pub Serv Comm*, 189 Mich App 151, 180; 472 NW2d 77 (1991), amended 442 Mich 911 (1993), the Court stated:

> To the extent that the PSC actually ordered Consumers to enter, or not enter, into any particular contract, it exceeded its authority. Contrary to Consumers' and the MCV's allegations, however, *the PSC did not explicitly order Consumers to enter into any particular contract or to abrogate any particular contract, but rather ordered that it would approve for purposes of § 6j only those contracts which met certain criteria*, leaving to Consumers the choice whether it would renegotiate its contract with the MCV and whether it would deal with any other particular [qualifying cogeneration and small power production facility]. [Emphasis added.]

---

[12] The Code of Conduct, at this point, was not yet part of the Administrative Code because it was effectuated by way of an order in a contested case.

[13] The current Code of Conduct does not contain this language. But Mich Admin Code, R 460.10102(1)(f), defines "[u]tility," in part, as "an electric, steam, or natural gas utility *regulated* by the public service commission[.]" (Emphasis added.) Further, we note that the PSC does not regulate OVEC pricing but *does* regulate the rates set by I&M. And in essence, MCL 460.10ee directed the PSC to establish rules for situations in which a PSC-regulated utility has interactions with services not governed by the PSC (it speaks of interactions "between a utility's regulated electric, steam, or natural gas services and unregulated programs and services").

[14] This subrule states, "A panel of the Court of Appeals must follow the rule of law established by a prior published decision of the Court of Appeals issued on or after November 1, 1990, that has not been reversed or modified by the Supreme Court, or by a special panel of the Court of Appeals as provided in this rule."

The PSC in the present case did not "explicitly order" I&M to enter into or abrogate a particular contract; rather, it passed the losses associated with the ICPA on to I&M's shareholders instead of on to ratepayers. See, e.g., *Kentucky West Virginia Gas Co v Pennsylvania Pub Utility Comm*, 837 F2d 600, 609 (CA 3, 1988) ("Regarding the states' traditional power to consider the prudence of a retailer's purchasing decision in setting retail rates, we find no reason why utilities must be permitted to recover costs that are imprudently incurred; those should be borne by the stockholders, not the rate payers.").

Also, I&M does not, on appeal, challenge the manner in which appellees arrived at their market-price benchmarks and, in the proceedings below, provided no alternative manner of evaluating market price. Accordingly, there is no basis on which to alter the benchmarks the PSC used.

We also reject I&M's argument that the PSC applied the Code of Conduct and its enabling statute retroactively to a decades-old contract and, in doing so, improperly impaired I&M's vested rights. Under a similar enabling statute, the market-price cap was already in effect as of 2001 and was ratified by the Legislature as stated in the 2005 decision of *Detroit Edison Co*, 472 Mich 897. The ICPA currently in effect was executed in 2010; it states that the agreement was being amended and restated in its entirety. Even if one were to argue that it is the latest, post-2010 version of the Code of Conduct that is being applied, the PSC was applying the market-cap provision prospectively as part of a reconciliation. The PSC is not forcing I&M to obviate vested contractual rights but is, as noted, passing on the financial burden of the imprudent contract to I&M's stockholders as opposed to ratepayers.

I&M argues that Mich Admin Code, R 460.10113; MCL 460.10c; and MCL 460.10ee(14) specify penalties for a violation of the Code of Conduct and that a disallowance of costs in a PSCR reconciliation is not a specified remedy. But there are other provisions of the code to which those penalties would apply. At issue in this case is the application of a specified compensation scheme—the lower of market price or 10% over fully allocated embedded cost—and not a "violation" per se.

### III. CONCLUSION

The plain language of the Code of Conduct indicates that it applies to the transaction at issue, and its application does not conflict with the standards of reasonableness and prudence from Act 304. In addition, a close reading of pertinent caselaw indicates that the Code of Conduct

-15-

complies with its enabling statute. Accordingly, the PSC did not exceed its authority by applying the code. Further, no retroactive application of law took place, and the remainder of I&M's arguments are similarly unavailing.[15]

Affirmed. No taxable costs, a public question having been involved.

/s/ Kristina Robinson Garrett
/s/ Anica Letica
/s/ Allie Greenleaf Maldonado

---

[15] I&M contends *in footnotes* that applying the Code of Conduct in this case would be an unconstitutional regulatory taking and violate the Contracts Clause. "Independent issues not raised in the statement of questions presented are not properly presented for appellate review." *Bouverette v Westinghouse Electric Corp*, 245 Mich App 391, 404; 628 NW2d 86 (2001). In addition, I&M attempts to raise *constitutional* issues by way of brief statements in footnotes. "An appellant's failure to properly address the merits of an argument constitutes the abandonment of an issue." *In re Application of Detroit Edison Co for 2012 Cost Recovery Plan*, 311 Mich App 204, 213; 874 NW2d 398 (2015). Therefore, we decline to address I&M's arguments.